UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DAVID J. PUGH,

                                        Plaintiff,

            v.                                                    5:04-CV-1094
                                                                 (C.J. Scullin)
COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

_____

APPEARANCES:                              OF COUNSEL:

OLINSKY & DI MARTINO                      HOWARD D. OLINSKY, ESQ.
Attorneys for Plaintiff

GLENN T. SUDDABY                          WILLIAM H. PEASE
United States Attorney for the            Assistant U.S. Attorney
  Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Frederick J. Scullin, Jr., Chief United States District Judge,  pursuant to 28 U.S.C. §

636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General

Order 18.

## PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits (DIB) on July 1,

1996, and on May 11, 1999. (Administrative Transcript ("T") at 65-67, 68, 69-71).

The 1996 application was denied initially and was not further appealed.  (T. 26, 30-33, 65, 268-79, 282-89).  The 1999 application was denied initially and on reconsideration, but was not appealed further.  (T. 27, 28, 34-38, 42-45, 69).  The reconsideration denial was dated September 22, 1999. (T. 42).

Plaintiff filed the present DIB application on March 14, 2001.  The application alleged disability as of February 9, 2001.  (T. 72-74).  This application was denied initially and on reconsideration.  (T. 29, 46-48, 367-74).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on March 19, 2003.  (T. 488-524).  The ALJ found that plaintiff was not disabled.  (T. 11-20).  The ALJ's decision became the final decision of the Commissioner  when the Appeals Council denied plaintiff's request for review on August 5, 2004.  (T. 6-8).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ erred in failing to recognize as severe impairments, plaintiff's Borderline Intellectual Functioning, learning disorders, and Sinus Bradycardia with Syncope. (Brief, p. 7).

(2) Plaintiff's impairments meet or equal the severity of the listed impairment at section 12.05C of Appendix 1. (Brief, p. 10).

2

(3) The ALJ failed to consider plaintiff's nonexertional limitations in determining plaintiff's Residual Functional Capacity (RFC). (Brief, p. 12).

(4) The ALJ erred in finding plaintiff capable of performing his past relevant work and erred in not complying with Social Security Ruling (SSR) 82-62. (Brief, p. 13).

(5) The ALJ's alternative finding that the Medical-Vocational Rules direct a finding of not disabled is improper because plaintiff suffers from significant non-exertional impairments. (Brief, p. 14).

(6) Plaintiff's application filed March 14, 2001 should have been treated as a request for re-opening his prior application since good cause for reopening was shown. (Brief, p. 15).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record and must be affirmed.

## FACTS

At the time of plaintiff's hearing on March 19, 2003, plaintiff was 50 years old. According to plaintiff, his birth certificate is not accurate and plaintiff claims that he is a few years older than his birth certificate would indicate. (T. 490). Plaintiff graduated high school and attended special education classes while in school. (T. 93, 95). Plaintiff also attended VESID[1] training and graduated from the Sidney Johnson

---

[1] VESID stands for Vocational and Educational Services for Individuals with Disabilities.

Vocational Center in 1996. (T. 112).  As a result of this vocational education, plaintiff was certified as a New York State automobile inspector. (T. 113).

According to a report completed for the New York State Office of Disability Assistance by an agency known as "Supports Unlimited", plaintiff worked at several jobs during the 1990's.  Plaintiff worked at Burger King as a maintenance person between 1991 and 1995.  (T. 113).  He also worked in a maintenance position from July, 1995 to March of 1997.  (T. 113).  During 1997, he held a job for several months with Meineke Muffler.  A Work History Report signed by plaintiff in March of 2001 lists the Burger King and maintenance jobs, in addition to jobs involving catering and serving food (T. 175); work as a taxi cab driver between 1980 and 1989 (T. 175); and work as a security guard between 1990 and 1991. (T. 94-95, 175).

In a Social Security "Work History Report", when plaintiff was asked to describe his work as an auto mechanic/oil changer, he stated that he used hand tools for automobiles and "had to know how to repair cars/change oil". (T. 178).  The plaintiff's response to this question also indicates that he used machines, tools, or equipment, and had technical knowledge or skills. (T. 178).  When asked by Social Security in 2002 to state his work background on a form, plaintiff submitted a slightly different listing of his prior jobs.  This list shows various jobs in 1992, 1993, 1995, 1999, and 2000 through employment agencies for temporary work. (T. 200, 200a).

4

At his March 2003 ALJ hearing, plaintiff stated that he worked in a factory, at construction, collecting garbage, doing janitorial work, and as an auto mechanic and oil changer. (T. 499, 500).  In addition, plaintiff stated that he attended school to learn how to use computers. (T. 501).  During his testimony, plaintiff also stated that he was unable to work because of dizziness and blackouts which occur several times each week.  The blackouts last approximately 5 to 10 minutes.  (T. 501, 507).  Plaintiff stated that he has not driven an automobile for the past two years (2001-2003) because of dizziness. (T. 495).  Plaintiff claims that the frequency of his dizzy spells has increased from one a week to as many as three each week. (T. 507).  Plaintiff also claims that he has shortness of breath and forgetfulness. (T. 508).  Plaintiff claims his blood sugar is low or becomes low and that he has "tired blood". (T. 512).  In reporting information to the Social Security Administration during March of 2001, plaintiff stated that he is unable to work because of a mild stroke on the left side of his body and because of depression. (T. 166).

Plaintiff's reasons for leaving his job as a mechanic/oil changer seem to vary depending upon the occasion.  During his testimony in 2003, plaintiff stated that he stopped working as a mechanic because he "passed out". (T. 514).  In a form completed during March of 2001, plaintiff stated that he was fired from his job as a mechanic/oil changer because "... I wasn't fast enough". (T. 184).  Plaintiff also has

stated that he was terminated from his job as an auto mechanic/oil changer because he forgot to replace the oil cap on an engine.  (T. 113).

During 2002, plaintiff applied to the Veterans Administration (VA) for a service connected disability, claiming Post Traumatic Stress Disorder and a nervous condition. (T. 80-85).  In his application, plaintiff claimed that he was in the United States Marines for four years and that he served in combat duty in Vietnam for thirteen months. (T. 80-85).  The VA denied plaintiff's request for a service connected disability and found after reviewing plaintiff's military records, that plaintiff was discharged from the Marines after two months, ***never served more than two months in the Marines, and never served in combat duty in Vietnam.***  (T. 80-85).  During a psychological examination in June of 1999, the plaintiff told psychologist Mark Matloff that he had been fined approximately two years prior by "some" entity for making false statements.  (T. 320).

## 1.  Medical Evidence

Plaintiff has had extensive medical treatment at the VA Hospital in Syracuse, New York. (T. 376-465).  The VA medical records show extensive testing for cardiac conditions (T. 376-79), dizziness (T. 392-403, 453), and slow heart rate with episodes of dizziness (T. 457, 465).  The VA records also show that plaintiff was taking a number of medications for depression (T. 450-452, 363, 458).

6

Plaintiff has had extensive medical tests concerning his heart or cardiac problems which have resulted in a finding of ***insignificant*** coronary artery disease and ***mild*** dysfunction in plaintiff's left ventricle. (T. 380).  Plaintiff has been given pulmonary function tests because of his claims of shortness of breath (T. 389) and has been prescribed the use of an inhaler. (T. 436).  Plaintiff suffers from a slow heart rate (Bradycardia) and low blood pressure. (T. 444, 456-7).

Plaintiff has had two consultative medical examinations by Dr. Kalyani Ganesh, one on June 2, 1999 and another on May 8, 2001.  Plaintiff was referred to Dr. Ganesh by the New York State Division of Disability Determinations. (T. 313).  At the June 1999 examination, plaintiff complained of having chest pain several times per week, shortness of breath, emphysema, chronic bronchitis, and "learning problems." (T. 313-14).  Plaintiff told Dr. Ganesh that he cooks, does some cleaning, shops, does laundry, some camping, goes fishing, and plays sports. (T. 314).  Dr. Ganesh found full range of motion in all of plaintiff's joints, full strength, and full ability to flex. (T. 315).  At the end of the examination report, Dr. Ganesh found that "in regards to work activities, [plaintiff] does not appear to have any gross physical limitations." (T. 316).  Dr. Ganesh stated that the plaintiff's prognosis was fair, and noted that plaintiff was also having a psychological examination that day. (T. 316).

During May of 2001, plaintiff was seen for an orthopedic examination by Dr. Ganesh. (T. 363-66).  Plaintiff again, told Dr. Ganesh that he was able to do some

cooking, cleaning, shopping and other activities. (T. 364).  Although plaintiff was using a cane when he arrived at Dr. Ganesh's office, plaintiff stated that he was able to walk without a cane, and Dr. Ganesh noted that plaintiff was "able to ambulate independently fairly briskly."  In her report, Dr. Ganesh stated that the use of the cane did "not appear to be a necessity." (T. 364).  Dr. Ganesh found full flexion and extension and rotary movements in plaintiff's cervical spine, and full range of motion in all of plaintiff's other areas and joints, including his hips, knees, and shoulders.  In essence, Dr. Ganesh found a totally normal orthopedic examination. (T. 363-366).

Plaintiff has been examined by psychologists on at least two occasions.  On January 19, 1996 Dr. Michael Boucher examined plaintiff at the request of VESID. (T. 203-206).  Dr. Boucher found that plaintiff had a marked learning disability in reading and a moderate learning disability in written expression. (T. 205).  Dr. Boucher found that plaintiff's Full Scale I.Q. was 80. (T. 204).  Dr. Boucher concluded that although plaintiff did have a diagnosis of Reading Disorder and Disorder of Written Expression, he appeared to have the intellectual resources needed to benefit from further education or training,[2] at least at a level equal to a BOCES program, a technical school, or a two year college, if he obtained help for the above disorders. (T. 205).

---

[2] It should be noted that this examination was a referral from VESID, whose purpose is to train individuals for possible job placement.  Thus, it is not unusual that Dr. Boucher would have focused upon the possibility that plaintiff could be further educated.

Dr. Boucher included a lengthy discussion regarding the type of materials that plaintiff would need for further education, the possibility that a tutor would help plaintiff's reading, and the accommodations that could be made for plaintiff to be able to take exams. (T. 205-206).  A handwritten note on Dr. Boucher's report stated that plaintiff had a diagnosis of "Borderline Intellectual Functioning." (T. 205).  The court also notes, however, that there is a cautionary paragraph contained in Dr. Boucher's report, stating that the results of the testing should not be viewed in isolation, but rather considered in the context of the plaintiff's overall condition. (T. 204).  The reader was advised that the tests were designed to "highlight problem areas" that might require attention, and thus, may "appear to emphasize relative weakness at the expense of focusing on strengths." (T. 204).

Three years later on June 2, 1999,[3] plaintiff was examined by psychologist Mark Matloff. (T. 320-22).  Dr. Matloff found plaintiff's Full Performance I.Q. to be 84, but his Full Scale I.Q. was only 77.  Dr. Matloff believed that plaintiff's Full Scale I.Q. puts him in the borderline range for mental retardation. (T. 321).  In Dr. Matloff's view, plaintiff was able to perform all simple tasks, but Dr. Matloff was unsure if plaintiff could perform *complex* tasks independently.  Dr. Matloff found that plaintiff could most likely relate adequately with co-workers and supervisors and deal with normal stress. (T. 321).  The doctor also found that plaintiff's difficulties would relate

---

[3] This is the same day that plaintiff was examined by Dr. Ganesh for the first time.

to his "slower" pace and need for more supervision due to his borderline intellectual functioning. (T. 321).  Dr. Matloff found that plaintiff's prognosis was "good" because there were "no major psychiatric problems." (T. 321-22).  Dr. Matloff had no diagnoses listed under Axis I or Axis II.[4] (T. 322).  Plaintiff has attended the Psychiatric/Psychology Clinic at the VA Hospital and has been prescribed the medications Prozac (T. 384) and Zoloft (T. 450).

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

---

[4] The diagnosis of mental disorders is based upon a system of classification that breaks an individual's case up into a series of "Axes".   Axis I contains clinical syndromes and "V" Codes, Axis II contains developmental disorders and personality disorders, and Axis III contains physical disorders and conditions.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the fifth and final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

A separate section of the regulations is used in addition to sections 404.1520 and 416.920 when there is evidence of a mental impairment. 20 C.F.R. §§ 404.1520a, 416.920a.  These sections refer to determining whether there exists a medically determinable mental impairment, and if found, determining the degree of functional limitation resulting from the impairment. *Id.* §§ 404.1520a(b), (c) and 416.920a(b) and (c).

11

1.     **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the

12

ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 2.    Severe Impairments

Plaintiff argues that the ALJ erred in failing to consider plaintiff's borderline intellectual functioning, learning disorder, and sinus bradycardia as "severe impairments."   Plaintiff appears to confuse the concept of a "severe" impairment with subsequent steps in the evaluation.  The ALJ in this case *found* that plaintiff *had a severe impairment* at Step 2 of the five-step evaluation procedure.  The ALJ found that plaintiff suffered from coronary artery disease and mild depression, "impairments that are severe within the meaning of the Regulations." (T. 15).

Plaintiff appears to argue that plaintiff's borderline intellectual functioning, his learning disorder, and his sinus bradycardia should have also been mentioned as "severe" impairments.  Plaintiff may be attempting to argue, and in fact later argues, that the ALJ did not consider the combination of plaintiff's impairments in his determination at Step 4 that plaintiff could perform his prior work.  It is true that once a "severe" impairment is found, the ALJ must consider all of plaintiff's medically determinable impairments in the remaining steps of the evaluation, even if the additional impairments may not be considered "severe" in isolation. *See Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995).  The court will consider plaintiff's

argument that his impairments were not properly considered in combination, in conjunction with the discussion of the ALJ's determination of plaintiff's RFC.

The court would also point out, however, that although plaintiff argues that his sinus bradycardia was not considered a "severe" impairment, the ALJ did consider plaintiff's "coronary artery disease" as a "severe" impairment. Plaintiff's sinus bradycardia *is* part of plaintiff's cardiac impairment, thus plaintiff is incorrect that the ALJ did not consider this a severe impairment.

Plaintiff states that his I.Q. level, or borderline intellectual functioning is a severe impairment. (Brief, pp. 7, 8). It has been held, however, that although borderline I.Q. may have an impact upon a plaintiff's employability, it is not "mandate" a conclusion that an I.Q. in the 70-79 range is "always" a severe impairment, and instead requires a case-by-case approach. *Brown v. Commissioner*, 00-CV-1147, 2005 U.S. Dist. LEXIS 14793, *14 & n.10 (N.D.N.Y. June 30, 2005).

Finally, an impairment (or combination of impairments) is "non-severe" under the regulations if it does not "significantly" limit the physical or mental ability to perform "basic work activities." 20 C.F.R. § 404.1521(a). Examples of basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work

situations; and dealing with changes in a routine work setting. *Id.* 404.1521(b)(1)-(b)(6).

Plaintiff argues that his reading and writing learning disorders would result in the necessity for a structured work environment or a low stress work environment. (Brief, p. 8). Plaintiff bases this argument on an opinion contained in a June 25, 1997 report by a job coach employed by an agency known as Supports Unlimited. (T. 109-114). However, the report states that plaintiff "seems to possess the necessary skills both social and academic, to perform the tasks that would be required in [the auto mechanic] area." (T. 113). The report also states that plaintiff can follow directions, can understand written directions, can write and print legibly, and can read at a sixth grade level. (T. 111).

With respect to the "requirement" of a "job coach", the report actually states that plaintiff "could benefit from Job Coaching services, at least for a short time, when beginning a new position, ***especially if it is in a field outside of automotive repair***." (T. 112)(emphasis added). Finally, the writer of this report concludes that plaintiff "could begin ***any*** new position working 40 hours per week. He has been consistently in the work force and would have ***no trouble*** continuing to do so." (T. 119)(emphasis added).

It would appear that a finding of non-severe, particularly based upon the report cited by plaintiff is supported by substantial evidence. It must be remembered that the

key word is that the impairment must "significantly" affect basic work activities. Although, it is clear that plaintiff's basic work activities are somewhat affected by his "learning disorder," there is ***no indication***, given the statements in the report cited above, that the limitations are "significant."

The other report cited by plaintiff was Dr. Boucher's January 22, 1996 psychological report. (T. 203-206). Although plaintiff's counsel cites this report for the proposition that plaintiff would need "supported employment services" even after remedial vocational and educational training, this does not indicate that plaintiff was "significantly" limited in his ability to perform basic work activities that are cited in the regulations. Dr. Boucher was focusing upon the diagnosis of the learning disability and how his educational and vocational abilities could be "improved". The report itself cautions that the report should not be viewed in isolation and may "appear to emphasize relative weaknesses at the expense of focusing on strengths." (T. 204). This report was also completed one and one half years prior to the Supports Unlimited report, and the author of the 1997 report took plaintiff's learning disabilities into account when making his determinations. (T. 112, §§ VII, VIII, IX, X).

Since the ALJ in this case ***did find*** that plaintiff had an impairment or combination of impairments that were "severe" and continued to analyze the possibility that plaintiff was disabled at the following steps of the five-step procedure, plaintiff's arguments that the ALJ did not consider other impairments as "severe" has

16

no merit.  Therefore, the ALJ's finding is supported by substantial evidence in this regard, and the court may proceed to continue to evaluate the ALJ's subsequent findings..

## 3.   <u>Listed Impairment</u>

Plaintiff argues that his I.Q. score of 74, together with his learning disorders and dizziness (syncope) are the equivalent of a listed impairment.  Plaintiff argues that his impairments meets the severity of a listing under the heading of Mental Retardation. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).  Section 12.05(C) requires a verbal, performance, or full scale I.Q. *between 60 and 70 and* "a physical or other mental impairment imposing *an additional and significant work-related limitation of function*. *Id.*  Plaintiff must meet all the requirements of the listed section.

In this case, Dr. Boucher found that plaintiff had I.Q. scores of 79, 80 and 82 for performance, full scale, and verbal I.Q. (T. 203).  Psychologist Mark Matloff found that plaintiff had I.Q. scores of 74, 77, and 84 as verbal, performance, and full scale I.Q.  *None* of these scores meet the severity of the first part of section 12.05(C). Plaintiff argues that I.Q. scores have a margin of error of 5 points, but only points to the fact that the error might reduce plaintiff's I.Q. scores by 5 points, whereas a margin of 5 points could mean that all of plaintiff's I.Q. scores were greater by 5 points than those listed.  In any event, this court is bound by the evidence in the record

and cannot speculate on what an I.Q. score *might be*.  Certainly the ALJ's finding that the severity of a listed impairment is *not* met is supported by substantial evidence.

### 4.  Residual Functional Capacity (RFC)

After determining that plaintiff has a severe impairment, but that the impairment does not meet the severity of a listed impairment, the ALJ must proceed to the next step and determine whether the plaintiff can return to his prior work.  The regulations now provide that in order to make that determination, the ALJ must consider plaintiff's RFC and whether that RFC will allow plaintiff to return to his prior work. 20 C.F.R. § 404.1520(a)(iv).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545; 416.945. *See also Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *LaPorta v. Bowen*, 737 F. Supp. at 183.  Furthermore, an ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

The ALJ found that plaintiff had the physical capability to perform light and sedentary work. (T. 18, 19). Plaintiff argues that this finding is not supported by substantial evidence in the record because the ALJ failed to "include any nonexertional impairment resulting from syncope, Borderline Intellectual Functioning, or Learning Disabilities." (Brief, p. 12, 13). It does not appear that plaintiff takes issue with the *physical* requirements, but rather with the effect of plaintiff's *non-exertional* or *mental* impairments on plaintiff's ability to work. Plaintiff argues that the ALJ did not consider the *combined effect* of all of plaintiff's impairments and that a Vocational Expert's testimony is necessary to determine whether plaintiff's ability to perform light and sedentary work is eroded by these non-exertional impairments. (Brief, p. 13).

The discussion of whether the "full range" of sedentary or light work is "eroded" by plaintiff's non-exertional impairments is a consideration that is left for the *fifth and final step* of the required analysis. *See Rosa v. Callahan*, 168 F.3d 72, 77-78 (2d Cir. 1999). This determination is made in order to assist the ALJ in determining whether or to what extent the ALJ may use the Medical Vocational Guidelines (the Grid). Before the ALJ concerns himself with the erosion of an exertional category of work, plaintiff has the burden to show that he cannot perform his prior work.

In this case, the ALJ found that plaintiff *could* perform his prior work, thus, although the ALJ was required to consider plaintiff's impairments "in combination", the ALJ did not have to determine whether the "full range" of work was affected by plaintiff's non-exertional impairments.  The ALJ had to determine whether, given the combination of plaintiff's impairments he was able to do his prior work.  The ALJ found that plaintiff could perform his prior work.

Plaintiff's counsel then argues that the ALJ erred in determining that plaintiff could perform his prior work.  Plaintiff's counsel focuses upon the Dictionary of Occupational Titles (DOT) "definition" of prior jobs that were "similar" to plaintiff's work.  He argues that since there is no DOT listing for the exact job that plaintiff performed, the ALJ was required to look at similar work for which there was a listing. (Brief at p.13-14).  Plaintiff cites various listings in the DOT and argues that he cannot perform any of those jobs because of his mental impairment.

When an ALJ is attempting *at step four* to determine whether a plaintiff can return to his or her previous work, the ALJ may consider *not only* how the job is defined in the DOT and performed in the national economy, *but also* may consider whether plaintiff may return to his or her *specific job*, regardless of its definition. 20 C.F.R. § 404.1560(b)(2); *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).

To support plaintiff's argument, he points to the reports of psychologists Mark Matloff and Michael Boucher which found that plaintiff had learning disabilities and

20

that plaintiff could perform simple tasks easily but might not be able to perform complex tasks independently. (T. 205, 322).  While it is true that two psychologists rendered opinions which believe that plaintiff may have limited capacity for certain types of work, the record shows that plaintiff has worked at many jobs involving physical activities and has been able to successfully perform those jobs.  It is also clear that plaintiff did not have jobs requiring extensive mental functions, and that most of these jobs **did not require** planning or the execution of complex tasks.  He had the same non-exertional impairments (borderline I.Q. and learning disabilities) when he was performing his prior work, and according to the Supports Unlimited evaluation, dated June 25, 1997, plaintiff could "begin any new position working 40 hours per week.  He has been consistently in the work force and would have no trouble continuing to do so." (T. 114).

Plaintiff's counsel argues that the security jobs were obtained through a temporary agency, and the oil changer job lasted only two months.  While this statement may be true, the court would point out that a Supports Unlimited report, dated June 16, 1998 states that plaintiff was working through Andrews Staffing Services, but was not cooperating with VESID and in fact, was looking for another job to "supplement" the hours he was receiving from Andrews. (T. 116).  The writer commented that plaintiff appeared not to need help from VESID because he was "doing his own job searches." (T. 116).  Plaintiff was later terminated from the

program, and the report stated that "plaintiff *was content*" to work at his temporary

jobs, but that he was told that he should reapply for support services at a later date. (T.

120).

Although plaintiff argues that the ALJ did not make a finding as to the physical

and mental demands of plaintiff's prior work, the record contains a description *by*

*plaintiff* of his tasks while working as a security guard and auto mechanic/oil changer.

(T. 178, 179).  The ALJ specifically referred to plaintiff's description of his jobs "in

submitted documentation." (T. 18).  The ALJ clearly found that *plaintiff's own*

*description* of his prior work was controlling, and did not need to make additional

findings since he accepted this description.  Both of these jobs involve simple tasks,

including changing the oil and/or minor repairs to automobiles, or patrolling certain

areas and making notes about observations.

The ALJ also found that plaintiff's testimony about the extent of his limitations

was *not credible*. (T. 17).  The ALJ found that plaintiff's statements of his limitations

were not supported by the medical evidence. (T. 17).  A review of the medical

evidence shows that plaintiff's impairments have been noted to cause a "mild" degree

limitation (T. 366), and although he testified that he uses a cane, Dr. Ganesh's opinion

was that plaintiff did not need the device. (T. 365-66).  A cardiac catheterization of

March 16, 2000 showed "insignificant" coronary artery disease. (T. 376, 474, 476).

Plaintiff's credibility was also questionable because it was clear from the

evidence that plaintiff had previously lied about or given different versions of events. Plaintiff testified that he was in Vietnam for four years, but the records show that plaintiff was denied veterans benefits because plaintiff was in the military for only two months and ***never*** was in Vietnam. (T. 80-85). There are other parts of the record that cast doubt on plaintiff's credibility. Plaintiff, for example gives three different versions about why he did not continue working at Mienke Muffler. He stated that he was fired (T. 113); that he worked too slowly (T. 122); and that he passed out while working as a mechanic. (T. 514-15).

Additionally, plaintiff admitted to psychologist Mark Matloff that in June of 1999, plaintiff had paid a fine for making "falsified statements 2 years ago." (T. 320). In a conference in May of 2001, plaintiff told a representative of the Social Security Administration that plaintiff had no psychological issues and had no emergency visits to the hospital for asthma. (T. 194). In July of 1996, plaintiff stated that he did not feel that he was disabled, "but I was told to come in to file." (T. 91).

## 6. **Medical-Vocational Guidelines**

Plaintiff argues that the ALJ's ***alternative*** finding that the Grids would direct a finding of not disabled is error because plaintiff has severe depression, learning disorders, and borderline intellectual functioning. (Brief, p. 14, 15). The court would point out that this "alternative" finding was added by the ALJ at the end of his written opinion. (T. 19). This determination was ***not*** included in the section of the decision

23

entitled "Findings" and apparently included only as further support for a finding of not disabled. (T. 20).

Since this court has found that the ALJ's finding that plaintiff can perform his prior work is supported by substantial evidence, the court need *not* proceed to step five of the analysis and need not consider whether the application of the Grid would have been appropriate in this case. The court would simply point out that the fact that a plaintiff has some non-exertional impairments does *not* automatically preclude the use of the Grid and does *not* automatically require the use of a VE. *See Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)(holding that the determination of whether to use the Grid should be made on a case-by-case basis, and that in order for the use of the Grid to be inappropriate, the ALJ must find that the plaintiff's non-exertional impairments "significantly limit" plaintiff's ability to perform an exertional category of work).

### 7. **Plaintiff's Prior Applications**

Plaintiff argues that his application of March 14, 2001 should be interpreted as a request to reopen his prior applications. This argument is not supported by the law. Plaintiff did not appeal the denials of his prior application, nor did he ask for reopening of the prior applications. The court would first point out that it has no jurisdiction over the *denial* of a request for reopening. *Byam v. Barnhart*, 336 F.3d 172, 179-80 (2d Cir. 2003).

24

In *Byam*, the court acknowledges that there are situations in which jurisdiction may exist if the Commissioner reviews the entire record and "constructively opens" the prior applications or when the plaintiff challenges the denial of the request to reopen is challenged on constitutional grounds. *Id.* at 180 (citations omitted).  There is no constitutional question in this case.  Plaintiff was clearly notified that the failure to appeal his reconsideration decision in 1999 would lead to a denial of a future application based on the same facts as the 1999 decision. (T. 42-43).  The ALJ also did not consider the prior applications.  In fact, the ALJ did not consider any medical evidence prior to the June 1999 reports.  To the extent that the court has considered prior evidence, it was as support for the ALJ's current decision and as background of plaintiff's condition.  Thus, plaintiff's claim that the case should be remanded to reopen the prior applications may be denied.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: September 26, 2005

_____

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

26